23-730. Thank you very much, Mr. Good morning, your honors. May it please the court. My name is Andrew Glass on behalf of Mark Canepari, Brandon Harris and Arnold Baker. As a threshold matter, the decision in this case to handcuff the plaintiff has already been deemed reasonable by the district court. As the decision to handcuff the plaintiff was reasonable, it necessarily carried with it the right to use some degree of physical force or coercion to affect the same under Graham v. Connor. Here, the defendants have presented admissible evidence from their own testimony and experience, as well as the contemporaneous conversations in the body-worn camera footage that they double-locked and checked the plaintiff's handcuffs for fit. The court determined that the plaintiff raised a material fact on this issue by simply stating that all the defendants did was tighten the handcuffs and by continuously complaining at the scene about her wrist, amongst her other complaints and yelling for the entirety of the time that she was in custody. You're arguing to us about whether the district court got it right as to whether something was or wasn't a dispute of material fact. Aren't you squarely in the realm of what you can't? Are you an interlocutory review of a qualified immunity determination? No, Your Honor. I'm not arguing with respect to the materiality of the fact. Just its applicability, as I'm about to get into, to Cugini, which was decided after this case. The Cugini case, which is the only case that the district court relied upon, was decided 18 months after the incident at issue in this case. So the fact that the court says that there's a disputed issue of fact, this court can still address the materiality of that issue. The materiality of that issue is in question because the case relied upon and the standard relied upon wasn't in effect at the time of this incident such that it was not clearly established for the officers on scene. So at Cugini, they actually, and thank you for pronouncing it for me. I'm sort of futzing that one. But there was a qualified immunity argument in that case, and it dealt with an incident that happened in 2014. And what strikes me about that case is they specifically concluded that the law was well, and that's not the only case in the mix, but it's certainly the most recent, that the law was well established that the use of excessive force in handcuffing was prohibited. The thing that wasn't clearly established as of 2014 was this scenario in which the individual being handcuffed might have manifested by their conduct that they were in pain, but they weren't saying, hey, stop, this is painful. That is decidedly not the case here. So aren't we bound by our prior determination that this was clearly established in 2014? Well, Your Honor, as those clearly established cases, in many of those cases that are cited and many of them from our district courts, there was actually specifically a finding or specifically testimony from the officers that the handcuffs weren't properly double locked and weren't properly checked for fit based on the fact that there was an individual they were arresting that was either resisting arrest or that they weren't properly trained in double locking or checking for fit. Here, that's not the case. Here, the admissible testimony is that the handcuffs were double locked. Okay, but this gets back to this factual dispute issue, right? So you're asking us in a posture where we only even have jurisdiction to consider this case. If we look at all the allegations from the plaintiff's perspective and we give, it's more than the summary judgment standard. It's sort of super deferential. And she's saying these things were way too tight, and you're telling us that in our analysis, we have to credit the testimony that it was double locked so it couldn't have been too tight. And I guess I'm wondering whether that really gets to exactly the kind of factual issue that needs to be resolved at the district court first. I would argue that it's not because going back to Cugini, which the court relied upon, the question that still needs to be answered is whether a reasonable officer on scene would have reason to believe that the handcuffs were causing injury. Here, if you watch the body cam footage, as the district court determined, from the moment that the plaintiff is placed in handcuffs almost until 35 minutes later when she's placed in an ambulance for an emergency medical committal, she's yelling, she's screaming, she's belligerent. Yes, she makes these complaints about the handcuffing and about her wrist hurting. But again, that's also in conjunction with her pulling away from the officers. That's in conjunction with in the back of the police cruiser, as the district court found. She was lying supine on her back, kicking at the partition in the police cruiser. And the officers on scene contemporaneously on the body cam, they were saying they weren't crediting that it was because the handcuffs were too tight that these injuries were being caused. They believed it was because of the plaintiff's own conduct. And so the question still needs to be whether a reasonable officer in their position would have believed that the handcuffs, based on what they knew at the time and based on the plaintiff's conduct at the time of the incident, whether they believed that it was tight, that the handcuffs being too tight is what were causing the injuries, or whether it was the plaintiff's own conduct. And they presented testimony and admissible testimony that they believed it was the plaintiff's conduct. The fact that she says the handcuffs were too tight, she doesn't, again, challenge the fact that they were double locked. She doesn't, but for saying that it's not on the body cam, which the district court said was understandable, given that the positioning of the body cam didn't show the handcuffing when it took place, all she relies upon for the fact that she says they weren't double locked and checked for fit is that it's not shown on the body cam. She doesn't present any other evidence beyond that, that the handcuffs were not properly checked for fit or double locked. And additionally, she doesn't present any information to say that when the pain occurred, or that the officers couldn't have reasonably believed that the pain was being caused by her own conduct, as opposed to the handcuffs being unreasonably tight. And at the very least, reasonable officers at the scene, which can be seen in the body-worn camera footage, could at least disagree as to whether the handcuffs were excessively tight under the circumstances then and there known to them. As distinguished from looking at it in hindsight or saying that the plaintiff says, well, the handcuffs were too tight now, so they must have been, we need to go back and look at what a reasonable officer would have believed at the time. And based on the admissible evidence that we've presented, we believe that a reasonable officer, as the officers did here, could have concluded that any injury or harm to the plaintiff's wrist were caused by her own conduct, as opposed to the handcuffs themselves, which the officers have testified and have produced admissible evidence to the fact, were double locked and properly checked for fit, which is distinguishable from all these other cases where time after time, the handcuffs were not properly double locked and checked for fit. And for that reason, we think there's a distinguishment both between Cugini again, which came out after this fact, and these other mostly district court cases, where more often than not, the handcuffs were not properly checked. How do you respond to footnote eight in Cugini that references case laws clearly as far back as 2008, that the prohibition against unduly tight handcuffing was clearly established? Right. Again, we respond to that, that in a majority of those cases, the unduly tight handcuffing was in cases where the officers have admitted that they weren't double locked, or there was admissible evidence that the handcuffs weren't double locked and checked for fit. Here, that's not the case. What happened to the testimony? Her testimony? Her only testimony is that the handcuffs were too tight. She hasn't testified as to the double lock. Why isn't that sufficient at this stage in the proceedings? Well, it's, again, insufficient at this stage in the proceedings, because, again, if we go to the other case law that is cited by the court in case, there's also determinations that in order to be even effective, handcuffs need to be somewhat tight. There's the determination of tightness is what the plaintiff perceived as tight, but in order to even be effective, the handcuffs need to be somewhat tight, and there's no evidence, no admissible evidence presented by the plaintiff here that there wasn't a proper check for fit or that there wasn't double locking. It's only her perception that they were too tight. But, again, we still need the handcuffs to be at least somewhat tight in order to be effective, and that, again, goes to the reasonableness of the officers on scene. Why isn't the established policy and procedure of double locking for fit and comfort sufficient for this court to find that a reasonable officer might need to, after complaint by a detainee, recheck? Well, there's no specific policy that's been cited with respect to having to recheck, and, again, we're talking about reasonable officers on the scene, and the fact that- The purpose of the policy, the longstanding policy of double locking and checking, is to avoid excessively tight handcuffing. Why isn't it sufficient, after complaint, to have the policy and procedure to recheck? Well, again, first, as to the qualified immunity argument, there hasn't been any cases cited to that effect standing for that proposition. And, second, as the district court found, during this time when the plaintiff's complaining about handcuffs, she's already in the back of a police cruiser. She is still being belligerent. It wouldn't necessarily have been a safe time at that moment for the officers to even get her out and check her for fit. And they told her multiple times, if you calm down, we will take you out of handcuffs. It was not their purpose to be there and putting her in the handcuffs and keeping her in the handcuffs. Their effort at that point, once she was in the cruiser, they were attempting to get her the help that she needed through the emergency medical evaluation, and they were attempting to get her out of the handcuffs. They offered multiple times throughout the admissible body cam footage that if she calmed down, they tried to get her husband and mother to calm her down, and then if she had calmed down, they would have taken her out of cuffs. She did not do so, and they were not given the opportunity to do that. All right. Thank you. Okay. We'll get to hear from you in a moment. Ms. Powell. Good morning, Your Honors. Good morning. My name is Neelu Powell, and I want to thank you for the opportunity to be heard in this matter. I want to interrupt you. Can you just reach up and pull that microphone down a little bit so we can hear you better? Thank you. Okay. Is this any better, Judge? I think so. Okay. As a non-attorney pro se, I'm going to apologize in advance because I am about to take the level of discourse down a significant notch. But before I do so, I'm going to say that the district court actually was correct. The defendants are not entitled to qualified immunity for two simple reasons. The facts show that their use of force in handcuffing was objectively unreasonable and excessive, and the law of the circuit as relates to the use of excessive force in handcuffing was well established at the time of the incident. Just to restate the relevant undisputed facts, which are captured on the body-worn cameras of the defendant police officers, and the background of this matter. One, on May 4th, 2018, the Wilton police defendants were served summons and complaints in the matter of Pal Visapala. The lead defendant in this matter, Mark Canapari, was at the time an unnamed DOE defendant in the Pal Visapala matter. On May 5th, 2018, Wilton police officer Mark Canapari arrived at my home claiming that he was there to investigate a misdialed 911 call. The other defendants, Brandon Harris and Arnold Baker, arrived shortly thereafter. The three police officers were immediately aggressive, entered the home without permission, and when they were told that they were not needed there, they informed me and my family members that I was going to be taken away in handcuffs, i.e. arrested. I fully complied with their instructions. Brandon Harris and Mark Canapari placed the handcuffs on me, initially extremely tightly, causing me severe pain. I continued to yell in pain and told them that I was in severe pain because of the handcuffs. In response, Mark Canapari and Brandon Harris tightened the handcuffs even more. In fact, it's captured on the body-worn camera recording of Mark Canapari and Brandon Harris that Mark Canapari is instructing Brandon Harris, words to the effect make them, meaning the handcuffs, smaller. So they intentionally further tighten the handcuffs, and this is captured in their own words on their own body-worn camera recordings. I and my family members, after this, repeatedly informed them, and admittedly I was yelling, screaming in pain and yelling profanities, all of which I stand by, and had my vocabulary been more extensive, I would have probably used more extensive profanity. For well over 40 minutes, the defendants were informed by myself and my family members that the handcuffs were severely injuring and causing me pain. At one point, my elderly mother is seen pleading with the police officers to please make the handcuffs loose or adjust them, and that that is why I was screaming and yelling in pain. I am actually saying so on the recordings. At one point, Mark Canapari insisted that I calm down, that I stop complaining, and that was the only way they were going to loosen the handcuffs or adjust them. I did exactly that. I sat in the back of the police cruiser calmly without making a sound. Mark Canapari entered the police cruiser, did some paperwork, sat there for a prolonged period of time, exited the police cruiser, and then told the other defendants, just ignore her, and pejoratively referred to me as being a drama queen. Despite having no reason to have arrested me or placed me in handcuffs, something that is borne out by Arnold Baker's statements to his fellow defendant, Tornello, that, quote, we could find no reason to arrest her, and further reiterating that the sole reason they were treating me and my family in this manner was, quote, there is no complaint, it's an Indian family, indicating that they were solely motivated by animus towards me and my family for racial or our national origin, because they perceived us as being an Indian family who was worthy of being treated in this improper manner. I have submitted in this matter extensive medical records, and a medical expert witness has reviewed all of the relevant body-worn camera recordings and the medical records and provided an opinion that the injuries to my right hand, the severe and progressive nerve injuries to my right hand are caused solely because of the excessively tight handcuffs. Getting on to the law in this matter, judges, when a defendant or a set of defendants invoke qualified immunity, the courts engage in a two-part inquiry. One, whether the facts shown make out a violation of the constitutional right, and two, whether the right at issue was clearly established at the time. The district court correctly conducted this two-part inquiry and found that both parts were met and denied the qualified immunity to these defendants appropriately. The crucial fact that the district court, in conducting its three-part analysis, found as being disputed was whether the handcuffs were too tight. Defendants have simply boldly asserted that the handcuffs were not too tight, and they couldn't have been too tight because, as the defendants claim, that they double-locked them, but there is no evidence to suggest that they double-locked them other than them at some point discussing double-locking them. Defendants absolutely do not address the fact that Mark Canepari and Brandon Harris, in fact, during the process of tightening the handcuffs, discussed making the handcuffs smaller, that is tighter. And the fact that I continued to complain after they made the handcuffs smaller and tighter as they planned, and the fact that I was solely complaining about the pain caused by the tight handcuffs. Defendants then go on to say that all of my injuries are caused by myself. This is where the discourse is going to get down a notch, judges. A police officer can simply say that the person that they have arrested has died because they stopped breathing, and hence it's their own fault. When a person is being subjected to excessive force, such as this excessively tight handcuffing, the defendants cannot then turn around and claim immunity for their very act of causing that particular injury and of causing the response, the natural human response of yelling out in pain. They cannot turn around and say, well, it's her own fault because she wouldn't. However, judges, the one crucial fact that they are relying upon, that the defendants are relying upon, is, well, she never did at any point calm down as we demanded. It's clearly belied by the fact that it's captured on Mark Canepari's own body-worn camera. He insisted that I calm down, that I stay quiet, and I did exactly that. I sat quietly within the police car while he sat around, did his paperwork for a prolonged period of time, and then in response, instead of loosening the handcuffs, went back and told everyone, ignore her, she's a drama queen. As a result of the 40-minute extremely tight handcuffs, I now have a permanent injury to the radial nerve, which has affected my ability to fully use my right hand. The defendants do not rebut the fact, the causation part of the injury. They do not rebut it other than saying simply that, well, it's her own fault. She shouldn't have yelled. She shouldn't have moved around trying to remove her weight from the handcuffs, and it's her own fault. As previously I mentioned, judges, a person under arrest whose airway has been compressed does eventually stop breathing after they struggle. So the police officers cannot turn around and claim that, well, it's your own fault that you weren't paying because we placed the tight handcuffs, and now you struggled to try and decrease the discomfort. It's your own fault. If you can sort of wrap it up just in terms of time, that's great. Your Honor, finally, and most importantly, I agree with you. This court does lack appellate jurisdiction over this matter, because the district court has already found that this is a question for a jury to decide. There is a material fact that is disputed. Were the handcuffs too tight? I say they were. Defendants say they weren't. And that is all I have. Thank you, judges. Thank you very much. Appreciate it. Mr. Glass, you have two minutes. Thank you, Your Honor. Why was this woman arrested? Your Honor, first I would like to point out she was not arrested as part of this case. There was a 911 call from her residence. On the 911 call, the district court specifically held in the summary judgment ruling, you can hear someone say in the background of the call, come hit me, you asshole. And the call is disconnected. The police send officers out to do a wellness check on a potential domestic violence incident. When the officers arrive, the plaintiff is belligerent from the start. She pushes at her husband on two occasions, and she attempts to push past the officers on at least one occasion. And that's why they put her in handcuffs and tell her multiple times. But she was arrested, right? She was not arrested. She was sent for an emergency medical committal. There's specific, in the summary judgment ruling, false arrest claim is gone. She was sent for an emergency medical committal. There were no charges arising from this case. It was simply at that point, once the officers were there, did their investigation, determined that there was not going to be an arrest. They turned to a community caretaking function, attempting to get the plaintiff the help that she needed. They sent her for an emergency medical committal under Connecticut General Statute 17A503. There's no false arrest claim left in this case. There's no malicious prosecution claim. These were all brought. They were all disposed of via summary judgment. That's because the court already determined that the decision to handcuff was reasonable itself. And I do want to point out a couple of other factual misstatements. Plaintiff makes a statement about her being an Indian family. That's addressed in the summary judgment ruling. Court said there was nothing to it. As to the smaller handcuffs, that's also addressed in the summary judgment ruling at footnote eight. Plaintiff claims that Canapari said we need to make the handcuffs smaller. No. Canapari asked Harris, and it's clear from the body worn camera footage, whether he needed smaller handcuffs to fit on the plaintiff's wrist. They said no. Plaintiff had complained about the pain. They double locked, checked her for fit. That's when they put her in the back of the police cruiser, and she was screaming occasionally about the wrist pain, but mostly at that point about her family to go away, to leave her alone, that she was being calm when she continued to be belligerent. And so after these initial complaints, that is when Officer Harris called over Officer Canapari to double lock and check the cuffs for fit. And while there were still some complaints in the back of the police cruiser, that happened after the initial handcuffing. There was that check in place to make sure they weren't too tight. And I see my time is up, so unless there's further questions. Thank you. Thank you very much. Appreciate it. Thank you both. We'll take that under advisement.